[Cite as *In re A.L.*, 2021-Ohio-1982.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF WAYNE | ) | |

IN RE: A.L.
    A.L.
    A.L.

C.A. Nos.    20AP0047
              20AP0048
              20AP0049
              20AP0052

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF WAYNE, OHIO
CASE Nos.    2018 JUV-C 000901
              2018 JUV-C 000902
              2018 JUV-C 000903

DECISION AND JOURNAL ENTRY

Dated: June 14, 2021

TEODOSIO, Judge.

{¶1} Appellants, P.L. ("Mother") and J.B. ("Father"), appeal from a judgment of the Wayne County Court of Common Pleas, Juvenile Division, that terminated the parental rights of three minor children and placed them in the permanent custody of Wayne County Children Services Board ("CSB"). This Court affirms.

I.

{¶2} Mother is the biological mother of the three minor children at issue in this appeal, who all have the same initials: A.L., born September 24, 2011; A.L., born June 27, 2013; and A.L., born January 7, 2016. Father, the only father to appeal, is the biological father of only the youngest child.

{¶3} During June 2018, CSB opened an investigation into this family because it had received referrals about Mother's ability to supervise the children and otherwise provide for their basic needs. CSB opened a voluntary case plan with the family at that time. The agency continued to receive referrals about the family, Mother did not comply with the voluntary case plan, and the family was forced to leave the shelter where they had been living and had no other place to go.

{¶4} On September 21, 2018, CSB filed complaints, alleging that these children were neglected and dependent. The children were removed from Mother's custody and placed in the emergency temporary custody of CSB. On October 31, 2018, CSB agreed to dismiss the allegations of neglect from the complaint, including three specific paragraphs of factual allegations, and the children were adjudicated dependent by agreement of the parties. They were later placed in the temporary custody of CSB and the trial court adopted the case plan.

{¶5} The case plan required Mother and Father to secure and maintain safe and stable housing, engage in parenting classes, and obtain mental health assessments and follow any treatment recommendations. The case plan also addressed some special needs of the children. For example, all three children had mental health and behavioral issues and the youngest two had speech delays. The children needed consistent, ongoing treatment to address those problems. The youngest child had severe speech delays and required immediate and consistent speech therapy and other intervention services at that time and for the foreseeable future.

{¶6} While the children had been in Mother's custody, she had not been consistent in getting them to their necessary counseling and speech therapy appointments. Consequently, Mother was required to demonstrate that she could consistently engage the children in their necessary counseling and speech therapy and/or intervention programs. She was also required to arrange to provide the children with protective daycare.

{¶7} Because Father had a history of substance abuse and perpetuating domestic violence, the case plan also required that he engage in relevant assessments and follow any treatment recommendations. During the first six months of the case plan, however, Father admittedly did not engage in services because he thought Mother would regain custody of his child.

{¶8} Because Mother made some progress on the case plan, the youngest child (Father's child) was permitted to have extended, unsupervised visits in Mother's home during December 2018 and January 2019. Beginning in January 2019, that child was placed with Mother for an extended visit, but he remained in the temporary custody of CSB. He remained placed with Mother for the next several months. During that time, however, Mother failed to consistently follow through with required speech therapy and other intervention services. Daycare services for the child were terminated by the provider because Mother would just show up with the child rather than comply with the provider's requirement that she schedule care for each week on the prior Sunday. The child was later removed from Mother's home and placed with a foster family.

{¶9} CBS filed two prior motions for permanent custody but dismissed them while the agency unsuccessfully pursued potential family or kinship placements for the children. On July 27, 2020, CSB moved for permanent custody of all three children. Following a hearing on the motion, the trial court terminated parental rights and placed the three children in the permanent custody of CSB.

{¶10} Mother and Father separately appealed, and their appeals were consolidated for review. They each raise two assignments of error that will be addressed jointly because they are closely related.

II.

**MOTHER'S ASSIGNMENT OF ERROR I**

THE TRIAL COURT ERRED AS A MATTER OF LAW AND ABUSED THE DISCRETION OF THE COURT BY MOVING FORWARD WITH THE GRANTING OF PERMANENT CUSTODY OF THESE CHILDREN IN LIGHT OF THE COVID-19 STATE RESTRICTIONS AND THE TOLLING OF THE TIME DEADLINES BY THE OHIO SUPREME COURT.

## FATHER'S ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY TO [CSB] AS [CSB] IMPEDED THE ABILITY OF [FATHER] TO COMPLETE THE CASE PLAN REQUIREMENTS DUE TO COVID RESTRICTIONS IMPLEMENTED BY THE AGENCY AND SERVICE PROVIDERS.

{¶11} Through these assignments of error, the parents challenge the trial court's finding on the first prong of the permanent custody test. Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child of the same parent has been adjudicated abused, neglected, or dependent three times; or that the child cannot be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D)(1). R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 98-99 (1996). Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." (Internal quotations omitted.) *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶12} The trial court found that the first prong was satisfied because the children had been in the temporary custody of CSB for more than 12 months of a consecutive twenty-two-month period. R.C. 2151.414(B)(1)(d). Although the parents do not dispute the court's time calculation,

these assigned errors raise a two-fold argument that the "12 of 22" ground was not appropriate in this case because of the global COVID-19 pandemic. First, Mother asserts that COVID-19 tolling orders authorized the trial court to provide them with more time to work on the case plan. Second, both parents assert that the trial court should not have terminated their parental rights based on the "12 of 22" ground because COVID-19 health restrictions curtailed the agency's ability to provide, and their ability to engage in, reunification services. We will address each argument in turn.

### Trial Court's Authority to Grant More Time

{¶13} At the commencement of the permanent custody hearing on October 31, 2020, Mother's counsel orally requested a continuance of the permanent custody hearing because Mother's ability to work on the case plan had been curtailed by COVID-19 restrictions. In denying Mother's request for a continuance of the permanent custody hearing, the trial court explained that this case had been pending for 25 months, that the motion for permanent custody had been pending for almost 120 days, and that Ohio statutory law did not authorize the trial court to delay the matter or extend temporary custody any longer. *See* R.C. 2151.414(A)(2) (requiring the court to hold the permanent custody hearing "not later than one hundred twenty days after the agency files the motion for permanent custody" except that it may extend the hearing for a reasonable period "for good cause shown[.]"); R.C. 2151.353(G) ("[T]he court shall not order an existing temporary custody order to continue beyond two years after the date on which the complaint was filed or the child was first placed into shelter care, whichever date is earlier, regardless of whether any extensions have been previously ordered[.]).

{¶14} On appeal, Mother does not assign error to the trial court's failure to grant a continuance of the permanent custody hearing or to extend temporary custody, so this Court need not reach that argument. *See In re F.R.*, 9th Dist. Lorain No. 14CA010543, 2015-Ohio-1877, ¶ 7.

Furthermore, "[c]ontinuances shall be granted only when imperative to secure fair treatment for the parties" and, absent emergency or unforeseen circumstances, "[a]ll requests for continuances must be made in writing and filed seven days before the scheduled hearing date." Juv.R. 23; Loc.R. 5.03(B) of the Court of Common Pleas of Summit County, Juvenile Division. Mother filed no written motion for a continuance. Instead, at the commencement of the permanent custody hearing, Mother's counsel orally requested a continuance of the hearing.

### Services Provided during the "12 of 22" Period

{¶15} Next, both parents argue that the trial court should not have terminated their parental rights under the "12 of 22" ground because their ability to work toward reunification was seriously hampered by the COVID-19 pandemic. Notably, for periods of time during the pandemic, many of their face-to-face services and visits with their children were replaced by virtual Zoom or Telehealth meetings. This Court recognizes that virtual visitations with parents' children inherently lack the quality of face-to-face interactions and that participants in virtual visits may be further impeded by their access to the requisite technology and the ability to use it effectively. Because communication restrictions were involuntarily placed on the parents due to the COVID-19 pandemic, their parenting ability and desire to reunify with their children should not be measured solely by their use of remote technology.

{¶16} Had the "12 of 22" calculation primarily involved time during which the parent's visits and services were limited by the pandemic, their arguments would be more persuasive. The facts in this case are not disputed, however, that the children were removed from Mother's custody on September 21, 2018. CSB already had been providing services through a voluntary case plan for several months. The oldest and youngest children were adjudicated dependent on October 31, 2018. The middle child was later adjudicated dependent on November 19, 2018. The children were

placed in the temporary custody of CSB on December 31, 2018, and the trial court adopted the case plan at that time.

{¶17}    According to R.C. 2151.414(B)(1)(d), the children's time in temporary custody began on the earlier of the trial court's adjudication of the children or 60 days after their removal from the home.  For ease of discussion, this Court will use the date of November 19, 2018, because all children had been adjudicated by that date.  CSB filed its motion for permanent custody on July 27, 2020, more than 20 months later.  *See In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, syllabus (the "12 of 22" must exist at the time the agency moves for permanent custody).  To the extent that the parents argue about how COVID-19 restrictions affected reunification services after the permanent custody motion was filed, that period was not relevant to this argument because it was outside the relevant "12 of 22" time frame.  *See id*.

{¶18}    Because CSB did not implement any COVID-19 restrictions on visitations or case plan services until March 2020, the parents had more than 15 months of court-ordered case plan services prior to any COVID-19 restrictions.  The parents have failed to demonstrate that COVID-19 restrictions prevented them from having a meaningful opportunity to work on the case plan for more than 12 months of a consecutive 22-month period.  Consequently, they have failed to demonstrate that the trial court erred in basing its first prong finding on the "12 of 22" ground. Mother's first and Father's second assignments of error are overruled.

## MOTHER'S ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED BY GRANTING PERMANENT CUSTODY OF THESE CHILDREN TO [CSB] IN THE ABSENCE OF THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED TO SUPPORT THE LEVEL OF THE CLEAR AND CONVINCING STANDARD THAT THIS DECISION WAS IN PROMOTION OF THE CHILDREN'S BEST INTERESTS.

## FATHER'S ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY TO [CSB], AS [CSB] FAILED TO SHOW BY CLEAR AND CONVINCING EVIDENCE THAT IT IS IN THE BEST INTEREST OF THE MINOR CHILD TO GRANT PERMANENT CUSTODY.

{¶19} The parents' remaining assignments of error challenge the trial court's finding that permanent custody was in the best interest of the children. When determining the children's best interest, the trial court must consider all relevant factors, including: the interaction and interrelationships of the children, the wishes of the children, their custodial history; and their need for permanence in their lives and whether such a placement can be achieved without a grant of permanent custody.[1] R.C. 2151.414(D)(1)(a)-(e); *see In re R.G.*, 9th Dist. Summit Nos. 24834 and 24850, 2009-Ohio-6284, ¶ 11.

{¶20} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations and citations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id*. at ¶ 21.

{¶21} The parents did not consistently interact with their children during this case. Prior to the implementation of COVID-19 health restrictions, they were permitted to have weekly, supervised visits with their children. Father did not participate in in-person visits initially, but Mother did. Because Mother had been engaging in case plan services and her visits were going

---

[1] Although the trial court is also required to consider whether any of the factors set forth in R.C. 2151.414(E)(7)-(11) apply, none of those factors are relevant in this case.

well, the trial court decided to allow Mother to have extended visits with the youngest child. Beginning in January 2019, that child was returned to Mother's home for an extended visit. Mother was required to enroll the child in a specific preschool and ensure that he consistently attended his speech therapy appointments.

{¶22} During the child's extended visit, Mother failed to demonstrate that she could meet the special needs of that one child. The child missed numerous speech therapy appointments and Mother did not enroll him in the preschool. The preschool reached out to Mother to follow up on enrolling the child, but Mother did not complete the registration process.

{¶23} Mother also failed to maintain protective daycare for the child. Mother initially had a licensed daycare provider for the child, who tried to accommodate Mother and other parents with variable work schedules. The provider explained, however, that state law limits her to caring for six children at a time and there is high demand for her services. Consequently, the daycare provider required that parents apprise her of their daycare needs each Sunday so she could plan her schedule for the following week. Mother did not schedule weekly as required and did not respond to the provider's follow-up calls or texts. The daycare provider ultimately terminated services because Mother continually showed up with the child without scheduling in advance.

{¶24} Upon CSB's motion and the recommendation of the guardian ad litem, the youngest child was removed from Mother's home in July 2019. There were also concerns at that time that Mother was allowing an adult male to be in the home without the approval of CSB or the trial court.

{¶25} The parents had at least seven more months after July 2019 to work on reunification before COVID-19 restrictions began. During that period, however, the parents missed many visits with the children and did not consistently engage in reunification services. Father testified at the

hearing, but the only reason he offered for not working toward reunification with his child was that he thought Mother would regain custody.

{¶26} On appeal, Mother faults the agency for failing to provide her with sufficient help, but the record reveals otherwise. CSB connected Mother with numerous service providers and arranged to have her children transported closer to Mother for visits. Mother's attendance at visits and with service providers was never consistent. The guardian ad litem and one service provider also came to Mother's home repeatedly, but Mother was rarely there for their scheduled visits.

{¶27} At the hearing, Mother attempted to justify her repeated no-shows by explaining that she often had to work overtime and could not miss work. When asked how she would address the mandatory overtime problem if her children lived with her, she explained that she would find another job with better hours. Mother had made no effort to find a new job, however, nor had she investigated childcare for the children. Mother admitted that she had no family support to help her with her children.

{¶28} When questioned on the subject, Mother testified that she would not be willing to continue working with CSB if the children were returned to her home. She explained that she did not need services and had been able to raise her children without assistance before this case began. Mother now has a home and expressed her belief that the only reason her children were removed from her custody was because she was homeless at that time.

{¶29} Next, the guardian ad litem testified about the wishes of the children. The youngest two children wanted to be able to visit Mother, but they were comfortable in their current placement. The oldest child wanted to return to Mother's home. If he could not do that, he wanted to stay in his current foster home.

{¶30} The guardian ad litem opined that permanent custody was in the best interest of all three children. They were all in need of stability and consistent participation in their required counseling and/or speech therapy. The oldest child had serious mental health and behavioral problems and needed consistent counseling and medication management. The youngest child still had a significant speech delay and would need ongoing speech therapy for the foreseeable future. Mother had failed to demonstrate a willingness or ability to ensure that the children would consistently continue with those services.

{¶31} Finally, the trial court considered the children's custodial history and their need for permanence. These children had been living in agency custody for more than two years by the time of the hearing. CSB had been unable to find any suitable friends or relatives who were willing or able to provide the children with a safe and stable home. Neither parent was able to provide such a placement at that time. With only one child in her home, Mother had failed to get the child to his required appointments. Through her testimony, Mother had also demonstrated a lack of insight into her family's needs for outside services.

{¶32} Father argues that the trial court based its best interest determination solely on his low IQ, which it was not permitted to do. *See In re D.A.*, 113 Ohio St.3d 88, 2007-Ohio-1105, syllabus. According to the written judgment entry, although the trial court considered Father's low level of cognitive functioning, that was not the sole focus of its best interest analysis. "'[A]lthough the trial court may not terminate parental rights solely based upon limited cognitive abilities, it is a factor that may be considered.'" *In re N.L.*, 9th Dist. Summit No. 27784, 2015-Ohio-4165, ¶ 21, quoting *In re Cunningham Children*, 3d Dist. Seneca Nos. 13-08-27, 13-08-28, 13-08-29, and 13-08-30, 2008-Ohio-5938, ¶ 13.

{¶33}    The evidence further demonstrated that Father lacked safe housing for the child. Father asserts that CSB never came to evaluate his home, but he admitted that he was in the process of gutting his home. The house had mold, no walls or ceilings, and exposed wires. This was not a suitable home for his then four-year-old child. Moreover, the evidence demonstrated that there was no strong bond between Father and his child.

{¶34}    The trial court reasonably concluded that permanent custody would provide these children with a safe and secure permanent placement. The parents have failed to demonstrate on appeal that the trial court lost its way in concluding that permanent custody was in the best interest of the children. Mother's second and Father's first assignments of error are overruled.

## III.

{¶35}    The parents' assignments of error are overruled. The judgment of the Wayne County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Wayne, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to

mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellants.

_____
THOMAS A. TEODOSIO
FOR THE COURT

CARR, P. J.
SUTTON, J.
CONCUR.

APPEARANCES:

RENEE JACKWOOD, Attorney at Law, for Appellant.

NIKKI LEIGH REED, Attorney at Law, for Appellant.

DANIEL R. LUTZ, Prosecuting Attorney, and ANDREA D. UHLER, Assistant Prosecuting Attorney, for Appellee.