[Cite as *In re K.R.*, 2021-Ohio-4474.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### SHELBY COUNTY

IN RE:                                            CASE NO. 17-21-12

    K.R.,

DEPENDENT CHILD.                                  O P I N I O N

[CRYSTAL R. - APPELLANT]

IN RE:                                            CASE NO. 17-21-13

    W.R.,

DEPENDENT CHILD.                                  O P I N I O N

[CRYSTAL R. - APPELLANT]


**Appeals from Shelby County Common Pleas Court**
**Juvenile Division**
**Trial Court Nos. 2018 DEP 0023 and 2018 DEP 0024**

**Judgments Affirmed**

**Date of Decision:  December 20, 2021**


**APPEARANCES:**

    *Royce A. Link* **for Appellant**

    *Madison S. Brinkman* **for Appellee**

**WILLAMOWSKI, P.J.**

{¶1} Appellant Crystal R. ("Crystal") brings this appeal from the judgments of the Court of Common Pleas of Shelby County, Juvenile Division, terminating her parental rights and granting permanent custody of the children to the Shelby County Department of Job and Family Services, Children Services Division ("the Agency"). Crystal claims on appeal that the trial court violated her rights to due process and that the judgments of the trial court were against the manifest weight of the evidence. For the reasons set forth below, the judgments are affirmed.

{¶2} W.R. was born to Crystal and Mitchell R. ("Mitchell") in 2008. ADoc. 1.[1] K.R. was born to them in 2012. BDoc. 1. In 2018, the Agency opened a case regarding the family due to concerns regarding Crystal's mental health and substance abuse issues. ADoc. and BDoc. 2. This case was closed in May of 2018 when the children were placed in the legal custody of their maternal uncle. ADoc. and BDoc. 2. On September 7, 2018, the uncle notified the Agency that he could no longer care for the children. ADoc. and BDoc. 2. Due to Crystal's failure to take the medication prescribed for her mental health issues, the Agency did not place the children with Crystal. ADoc. and BDoc. 2. On November 27, 2018, the Agency filed a complaint alleging that the children were dependent. ADoc. and BDoc. 2. The initial hearing was held on December 13, 2018. ADoc. and BDoc. 33. At that

---

[1] The docket for W.R. is identified as "ADoc." The docket for K.R. is identified as "BDoc."

time, the magistrate ordered that the children be placed in the temporary custody of the Agency. ADoc. and BDoc. 33. A case plan was filed requiring Crystal to 1) obtain and maintain stable and safe housing, 2) only allow safe and appropriate people in the home and around the children, 3) cooperate with the Agency assigned coach, 4) complete a drug and alcohol and mental health assessment, 5) cooperate with all requested drug screens, 6) obtain medical coverage, 7) sign all releases, 8) follow the professional recommendations, and 9) attend all professional meetings. ADoc. and BDoc. 34. Following an adjudicatory hearing on January 10, 2019, the children were determined to be dependent and the temporary custody of the Agency was continued. ADoc. and BDoc. 48.

{¶3} On January 24, 2019, Misty Shields ("Shields"), the guardian ad litem, filed her report. ADoc. and BDoc. 49. Shields indicated that W.R. was very interested in seeing Mitchell right away, but did not appear to be eager to see Crystal. ADoc. and BDoc. 49. Shields was concerned that W.R. was "yelling a lot" during her visit. ADoc. and BDoc. 49. As to K.R., Shields noted that he was very quiet and did not want to interact. ADoc. and BDoc. 49. Although K.R. seemed happy in the home, he was yelling and hitting another child in the home which resulted in that child having a bloody lip and K.R. also hit the child's head against the wall. ADoc. and BDoc. 49. Because of this behavior, the foster parents were asking that the boys be removed from their home for the protection of the other children in the home. ADoc. and BDoc. 49. Shields noted that when she met with

Crystal before the adjudicatory hearing, she was agitated and was yelling and cursing at her attorney and the case worker. ADoc. and BDoc. 49. Crystal told Shields that the Agency had "stolen" her children and that she did not want to work the case plan. ADoc. and BDoc. 49. Shields had tried on two other occasions to contact Crystal with no success. ADoc and BDoc 49. Though Crystal had been given Shields' contact information, she did not contact Shields. ADoc. and BDoc. 49. Shields also noted that security was required at visits due to threats made by Crystal to kill everyone involved. ADoc. and BDoc. 49. Shields recommended that the children stay in the temporary custody of the Agency. ADoc. and BDoc. 49.

{¶4} On January 28, 2019, the Agency filed a motion to have temporary custody of K.R. be awarded to his paternal grandmother. BDoc. 54. This motion was heard at the disposition hearing on January 31, 2019. BDoc. 67. The trial court granted the motion and K.R. was placed in the temporary custody of his grandmother under the protective supervision of the Agency. BDoc. 67. W.R. remained in the temporary custody of the Agency. ADoc. 67.

{¶5} On March 15, 2019, the Agency removed Crystal from the case plan. ADoc. and BDoc. 68. The basis for the removal was that Crystal had not scheduled any appointments for her assessments, tested positive for drugs on three separate screens, and had missed two consecutive visits. ADoc. and BDoc. 68. The Agency noted that Crystal was unwilling to work with the Agency to be reunified with her

children. ADoc. and BDoc. 68. The trial court approved this amendment to the case plan on May 6, 2019. ADoc. and BDoc. 77.

{¶6} On April 12, 2019, Mitchell filed a motion to have custody of the children returned to him. ADoc. and BDoc. 72. An administrative review was held on May 21, 2019. ADoc. and BDoc. 79. The review indicated that Mitchell had made significant progress in completing the case plan. ADoc. and BDoc. 79. The Agency recommended that the trial court grant Mitchell's motion for custody with protective supervision. ADoc. and BDoc. 79. Shields also filed a report. ADoc. and BDoc. 80. Shields noted that the children had not had contact with Crystal for several weeks and both expressed interest in moving back home with Mitchell. ADoc. and BDoc. 80. Shields recommended that the children be placed in the custody of Mitchell. ADoc. and BDoc. 80. Temporary custody was granted to Mitchell subject to protective supervision on June 5, 2019. ADoc. and BDoc. 87.

{¶7} The Agency filed a motion requesting temporary custody of the children on September 6, 2019. ADoc. and BDoc. 96. The basis for the motion was that Mitchell had tested positive for use of methamphetamines and failed to enroll the children in school resulting in excessive absences. ADoc. and BDoc. 96. On September 11, 2019, a hearing was held on the motion and the children were returned to the custody of the Agency. ADoc. and BDoc. 101. A new case plan was then filed by the Agency reinstating services for Crystal. ADoc. 103 and BDoc.

102. The Agency set the same requirements as were previously ordered for Crystal. ADoc. 103 and BDoc. 102.

{¶8} The next case review was completed on November 7, 2019. ADoc. 108 and BDoc. 109. The review indicated that Crystal was living with her brother and an adult son, the home was clean and appropriate, and that Crystal had maintained employment for ten months. ADoc. 108 and BDoc. 109. Crystal had also completed the assessments on September 10, 2019, but had not scheduled any follow up services. ADoc. 108 and BDoc. 109. Crystal was working cooperatively at the visits as well. ADoc. 108 and BDoc. 109. However, the Agency determined that the progress since September was insufficient. ADoc. 108 and BDoc. 109. The trial court also found that as of November 7, 2019, Crystal was not in substantial compliance with the case plan. ADoc. 110 and BDoc. 108.

{¶9} On February 20, 2020, a review hearing was held. ADoc. and BDoc. 116. At that hearing, evidence was presented that Crystal had been evicted from her home and was temporarily living with one of her adult sons. ADoc. and BDoc. 116. The trial court noted that the Agency had offered mental health services for Crystal through the Family Resource Center ("FRC"), but Crystal had refused. ADoc. and BDoc. 116. The trial court also noted that Crystal had been testing positive for THC in her drug screens after testing negative on November 17, 2019. ADoc. and BDoc. 116. Following the hearing, the trial court concluded that Crystal

was not in substantial compliance with the case plan at that time. ADoc. and BDoc. 116.

{¶10} At the May 14, 2020, review hearing, evidence was presented that Crystal was still without an independent living arrangement and that she had completed a new mental health assessment, but not had not enrolled in services. ADoc. and BDoc. 119. Evidence was also presented that Crystal had one positive test for THC and one negative drug test. ADoc. and BDoc. 119. Again the trial court determined that Crystal was not substantially complying with the case plan. ADoc. and BDoc. 119. These issues were all remedied by the August 6, 2020 review hearing. ADoc. and BDoc. 120. Testimony was presented at that hearing indicating that Crystal was living independently, had a negative drug screen, was attending counseling, and was attending virtual visits with the children. ADoc. and BDoc. 120. The trial court then found that Crystal was substantially complying with the case plan at that time. ADoc. and BDoc. 120

{¶11} The Agency conducted a case review on October 21, 2020. ADoc. and BDoc. 132. The Agency recommended that the temporary custody be continued because Crystal was inconsistent in complying with the professional recommendations. ADoc. and BDoc. 132. The Agency noted in the review that Crystal had been having in home visits since September 15, 2020, but they had to be returned to the Agency after Crystal moved her second adult son and his family into the two bedroom home and indicated that she was hearing voices. ADoc. and

BDoc. 132. This was a concern because Crystal refused to elaborate on what the voices were saying. ADoc. and BDoc. 132. The Agency also noted that Crystal had again become inconsistent with attending sessions at FRC. ADoc. and BDoc. 132.

{¶12} On November 2, 2020, the Agency filed a motion for permanent custody of the children. ADoc. and BDoc. 133. The basis for the motion was that the children had spent 12 of the last 22 months in the temporary custody of the Agency and that Crystal had failed to substantially comply with the case plan to remedy the reasons that caused the removal of the children. ADoc. and BDoc. 133. A hearing was held on this motion on March 4 and 5, 2021. ADoc. 184 and BDoc. 179. After the hearing, the trial court terminated the parental rights of Crystal and Mitchell and awarded permanent custody of the children to the Agency. ADoc. 184 and BDoc. 179. Crystal appealed from these judgments. ADoc. 193 and BDoc. 180. On appeal, Crystal raises the following assignments of error.

**First Assignment of Error**

**The trial court violated [Crystal's] constitutional 14ᵗʰ Amendment Right to due process and equal protection under the law.**

**Second Assignment of Error**

**The trial court' decision was against the manifest weight of the evidence in the determination that the children cannot be placed with Crystal in a reasonable time, or should not be placed with Crystal.**

**Third Assignment of Error**

**The trial court's decision was against the manifest weight of the evidence, because the evidence did not support a finding that the Agency made reasonable efforts to effect reunification.**

**Fourth Assignment of Error**

**The trial court's decision was against the manifest weight of the evidence because the evidence did not support a finding that the termination of parental rights of [Crystal] was in the children's best interest.**

*Due Process*

{¶13} In the first assignment of error, Crystal claims that she was denied due process when COVID 19 restrictions prevented her from working the case plan. Her argument is that the trial court should not have granted the Agency's motion for permanent custody because the Agency received temporary custody in September of 2019 and a significant portion of the time was when services were limited due to COVID 19 restrictions. According to Crystal, this impeded her ability to work the services.

{¶14} There is no dispute that COVID 19 restrictions affected how case plans could be approached. The ability to utilize in-person services, such as visitation, was significantly restricted for a limited time. If the 12 out of 22 months time frame had been primarily during the time the COVID 19 restrictions were in place, this argument may be more persuasive. *See In re A.L.*, 9th Dist Wayne Nos. 20AP0047, 20AP0048, 20AP0049, 20AP0050, 2021-Ohio-1982, ¶ 16, 173 N.E.3d 1260.

However, the motion for permanent custody was filed on November 2, 2020, which means that the time to be reviewed goes back to January 2, 2019. The record shows that the children were placed in the temporary custody of the Agency before this day. W.R. remained in the temporary custody of the Agency until June 5, 2019, which is 154 days within the time frame in question. He then was returned to Mitchell. On September 11, 2019, he was returned to the temporary custody of the Agency. This accounted for another 418 days. Thus W.R. was in the temporary custody of the Agency for a total of 572 days or approximately 19 of the 22 months before the filing of the motion for permanent custody.

{¶15} K.R. was also placed in the temporary custody of the Agency before January 2, 2019. He was placed with his paternal grandmother on January 31, 2019, so had 29 days of countable time. Like W.R., K.R. was returned to the temporary custody of the Agency on September 11, 2019, for an additional 418 days. K.R. was therefore in the temporary case of the Agency for a total of 447 days or approximately 15 of the 22 months before the filing of the motion for permanent custody.

{¶16} The Agency originally opened a case involving the boys in the winter of 2018. COVID 19 restrictions were not implemented until April of 2020. During all of this time, the Agency had a requirement that Crystal seek mental health services as part of the plan. This means that Crystal had approximately two years prior to the implementation of the COVID 19 restrictions to make progress on the

case plan, but chose not to do so. In March 2019, Crystal even asked to be removed from the case plan because she did not wish to work it. She did not ask to be reinstated to the case plan until September 2019. Although she was again offered services, Crystal made no attempt to utilize them before 2020. In February of 2020, she completed the assessment, but made no attempt to follow through with the recommendations, instead telling her case worker that she did not believe she needed help. Tr. 334-35. During the time services were restricted, Crystal continued to refuse to utilize the mental health services when her case worker would speak with her about beginning services. Tr. 334-338. The case worker spoke with Crystal on March 13, April 9, May 14, and June 5, 2020. Tr. 336-37. On each of those occasions, Crystal refused mental health services, claiming either she did not need them or that she did not want people poking around in her mind. Tr. 336-37. Crystal only agreed to begin services on July 17, 2020, which was after she had been informed that visits would be returning to in person instead of via telephone. Tr. 340. For a short time, Crystal was in compliance, which caused the trial court to determine that she was in compliance with the case plan at the August 6, 2020, hearing. This led to her having the visits moved to an in-home setting. However, this did not last long as by the end of September 2020, the visits were returned to the Agency due to Crystal's hearing voices and no longer attending all of the visits.

{¶17} Based upon the record before this Court, no evidence was presented that would indicate that Crystal's ability to work the case plan was impeded by the

COVID 19 restrictions. The record clearly reflects that Crystal chose not to substantially comply with the case plan, not that she was prevented from doing so. Therefore, Crystal was not denied due process when the trial court considered whether the children had been in the temporary custody of the Agency for 12 out of the 22 months immediately preceding the motion for permanent custody. The first assignment of error is overruled.

*Manifest Weight of the Evidence*

{¶18} In her second, third, and fourth assignments of error, Crystal claims that the judgments of the trial court were not supported by the manifest weight of the evidence. The right to parent one's own child is a basic and essential civil right. *In re Murray*, 52 Ohio St.3d 155, 556 N.E.2d 1169 (1990). "Parents have a 'fundamental liberty interest' in the care, custody, and management of their children." *In re Leveck*, 3d Dist. No. 5–02–52, 5–02–53, 5–02–54, 2003–Ohio–1269, ¶ 6. These rights may be terminated, however, under appropriate circumstances and when all due process safeguards have been followed. *Id.* When considering a motion to terminate parental rights, the trial court must comply with the statutory requirements set forth in R.C. 2151.414. These requirements include, in pertinent part, as follows.

> **(B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the**

**agency that filed the motion for permanent custody and that any of the following apply:**

**(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, * * * and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.**

**\* \* \***

**(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *.**

**\* \* \***

**For the purposes of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to [R.C. 2151.28] or the date that is sixty days after the removal of the child from the home.**

**\* \* \***

**(C)  In making the determination required by this section * * *, a court shall not consider the effect the granting of permanent custody to the agency would have upon any parent of the child.  A written report of the guardian ad litem of the child shall be submitted to the court prior to or at the time of the hearing held pursuant to division (A) of this section * * * but shall not be submitted under oath.**

**If the court grants permanent custody of a child to a movant under this division, the court, upon the request of any party, shall file a written opinion setting forth its findings of fact and conclusions of law in relation to the proceeding.  The court shall not deny an agency's motion for permanent custody solely**

> **because the agency failed to implement any particular aspect of the child's case plan.**

R.C. 2151.414. A court's decision to terminate parental rights will not be overturned as against the manifest weight of the evidence if the record contains competent, credible evidence by which a court can determine by clear and convincing evidence that the essential statutory elements for a termination of parental rights have been established. *In re S.L.*, 3d Dist. Shelby Nos. 17-17-17, 17-17-18, 17-17-19, 2018-Ohio-900, ¶ 24.

{¶19} The determination whether to grant a motion for permanent custody requires a two-step approach. *In re L.W.*, 3d Dist. Marion Nos. 9-16-55, 9-16-56, 2017-Ohio-4352, ¶ 5. The first step is to determine whether any of the factors set forth in R.C. 2151.414(B)(1) apply. *Id.* If one of those circumstances applies, then the trial court must consider whether granting the motion is in the best interest of the child by considering the factors set forth in R.C. 2151.414(D). *Id.*

{¶20} Crystal claims in her second assignment of error that the trial court erred in finding that the children could not or should not be placed with her within a reasonable time. This Court notes that the motions for permanent custody alleged that the children had been in the temporary custody of the Agency for more than 12 out of the immediately preceding 22 month period. This provision set forth in R.C. 2151.414(B)(1)(d) does not require a finding that the children cannot or should not be placed with the parent within a reasonable period of time. "[A]s long as a child

meets the '12 of 22' requirement, an agency is no longer required to prove that a child cannot be returned to the parents within a reasonable time or should not be returned to the parents." *In re E.B.*, 12th Dist. Warren No. CA2009-10-139, 2010-Ohio-1122, ¶ 20, citing *In re C.W.,* 104 Ohio St.3d 163, 2004-Ohio-6411, ¶ 21, 818 N.E.2d 1176. *See In re B.R.* 10th Dist. Franklin Nos. 18AP-903, 18AP-904, 2019-Ohio-2178, ¶ 46. As discussed above, W.R. was in the temporary custody of the Agency for approximately 19 months and K.R. for 15 months of the 22 months immediately preceding the filing of the motion for permanent custody. The trial court specifically found that the 12 out of 22 month provision of R.C. 2151.414(B)(1) applied. Since the trial court was not required to make a finding as to whether the children could be returned to Crystal within a reasonable time, any alleged error could not be prejudicial.

{¶21} Even if the trial court was required to make a finding that the children could not or should not be returned to Crystal within a reasonable time, the record shows that this is a reasonable conclusion. Emily Long ("Long") testified that she was Crystal's mental health counselor at FRC. Tr. 10-12. Long diagnosed Crystal with Bipolar I with psychotic features. Tr. 13. According to Long, Crystal was inconsistent with her treatment and was unable to say whether Crystal would be able to care for her children. Tr. 15-19, 36, 39, and 52. Long also indicated that Crystal had poor insight in that she saw and heard things that weren't real, accepting them as true despite contradictory evidence. Tr. 44, 50.

{¶22} Janice Geise ("Geise") was the family coach for Crystal. Tr. 139. Geise testified that Crystal did not take redirection well, responding defiantly when given instructions. Tr. 143-145. Geise also testified that during the September 2020 visits, she was concerned because Crystal allowed extra, unapproved people to be at the visits and Crystal told Geise that she was hearing voices. Tr. 149-153. Crystal informed Geise that she was not attending therapy at that time because she "needed a break". Tr. 153. According to Geise, Crystal is more a friend to the children than a parent and is inconsistent. Tr. 161-163.

{¶23} Wes Branscum ("Branscum") testified that he was the ongoing case worker for this family. Tr. 199. Bramscum indicated that Crystal lacked suitable housing because she was living in a two bedroom, approximately 1,000 square foot home with six other people. Tr. 216-218, 270. The home was not big enough to add W.R. and K.R. to the total. Branscum then gave Crystal a choice of either 1) moving all of them to a larger home or 2) moving the one son and his family out of the home. Tr. 220. Branscum offered to help, but as of the hearing date, Crystal had not taken any of the necessary steps to find new housing for anyone. Tr. 221-23. Branscum also noted that Crystal had not attended the budgeting skills sessions at FRC, worked on her parenting skills or consistently worked on her mental health issues. Tr. 228-42. Additionally, Crystal was required to attend all professional meetings, yet she only attended three out of thirteen and her participation was minimal when she attended. Tr. 248.

{¶24} Shields testified that she is the CASA assigned to the case. Tr. 379. In her testimony and her submitted report, Shields noted that Crystal was inconsistent with her counseling. Ex. I. Shields testified that Crystal was stressed and overwhelmed. Tr. 386. Shields' conclusion was that if the children were to be returned to Crystal, she would not be able to handle it and the Agency would have to remove the children again. Tr. 386 and Ex. I. Given all of the evidence and the lack of progress Crystal had made in the years that her family was involved with the Agency, the record supports the trial court's determination that the children could not or should not be returned to the home within a reasonable time. The second assignment of error is overruled.

{¶25} In the third assignment of error, Crystal claims that the trial court erred in finding that the Agency had made reasonable efforts at reunification. "When the Agency intervenes to protect a child's health or safety, the efforts by the state to permit the child to return home by removing the threat are called 'reasonable efforts'". *In re Da.R.,* 3d Dist. Shelby No. 17-18-13, 2019-Ohio-2270, ¶ 17. The Agency must make a reasonable effort to reunify the family prior to the termination of parental rights. *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 43, 862 N.E.2d 816. "Reasonable efforts" are only an issue at the permanent custody hearing if the trial court has not previously determined that the agency used reasonable efforts to reunify the family. *In re J.H.*, 10th Dist. Franklin Nos. 19AP-517, 19AP-518, 2021-Ohio-807, ¶ 64.

-17-

{¶26} Here, the Agency's efforts were set out in numerous case plans. At the case review conducted on October 21, 2020, the Agency set forth what was required of Crystal to complete the case plan and the progress she had made. ADoc. and BDoc. 132. The case plan required Crystal to 1) maintain appropriate housing and employment, 2) only expose her children to appropriate persons, 3) visit with the children and participate with in-home coaching, 4) participate in mental health services, 5) submit to random drug screens, 6) obtain medical insurance, 7) sign necessary releases, 8) follow professional recommendations, and 9) attend and participate in professional meetings. ADoc. and BDoc. 132. According to the review, Crystal had complied with maintaining employment, not exposing the children to inappropriate people, obtaining medical insurance, and signing the necessary releases. ADoc. and BDoc. 132. The remaining goals all had outstanding issues. The review also identifies the steps taken by the Agency to help Crystal.

> **The [Agency] has worked to provide Crystal with mental health and parenting education services to reduce the risk of abuse/neglect if the children were to be returned to the home. These services are provided through [FRC]. Crystal has chosen to remain inconsistent in these services which prohibit the [Agency] and professionals from determining if proper progress is being made to reunify the children to the home. The [Agency] conducts monthly visit [sic] to Crystal's home to discuss case plan goals and progress made to returning children to the home. The [Agency] holds monthly team meetings for Crystal to participate in and voice any concerns as well as discuss any progress being made.**

ADoc. and BDoc. 132 at 10-11.

{¶27} Branscum testified that he attempted to assist Crystal in finding suitable housing, but she did not take the steps necessary for the Agency to be able to help. Tr. 221. According to Branscum, the Agency even spoke with FRC about adjusting Crystal's therapy to just mental health so that Crystal would not be overwhelmed and could focus on the most important issue. Tr. 229. Branscum testified that the Agency did all it could to help Crystal. Tr. 226.

{¶28} Shields indicated in her testimony and in her report that Crystal had refused to begin working the case plan until the trial court mandated it even though she was told that the sooner she started, the sooner the children could be returned home. Ex. I at 6. Shields also indicated that she had several conversations with Crystal requiring the need to find appropriate housing or move the extra family out of her house, but Crystal still refused even after being told she could lose her children. Ex. I at 6-7. According to Shields, Crystal stopped going to counseling because she was mad and needed a break, though Crystal had told her she did not agree with going. Ex. I at 7. Despite numerous attempts by Shields and Branscum to persuade Crystal to continue counseling so that she could get her children back, Crystal was still sporadic in her attendance of counseling. Ex. I at 9.

{¶29} In several judgment entries, the trial court made a finding that the Agency was making reasonable efforts in its permanency plan and was complying with the case plan. See ADoc. 48, 62, 66, 77, 86, 87, 101, 107, 110, 116, 119, 120,

126, 148 and BDoc. 47, 48, 66, 77, 86, 87, 91, 101, 107, 116, 119, 120, 126, 148.

The trial court in its judgment entry made the following statements.

> **Throughout this case, the [Agency] has been more than willing to work with Crystal and provide her additional opportunities to complete services. Crystal was encouraged to engage in mental health counseling. The Agency was also willing to help Crystal find new housing to accommodate the children and the family currently residing in her two-bedroom house. Crystal chose not to use the help offered by the [Agency] and did not remove anyone from her home or find a new residence. In addition, Crystal indicated that doing mental health counseling, parenting education, and budgeting at once was too stressful. The [Agency] agreed to work with Crystal to first allow her to work on her mental health counseling. Regardless, after the twenty-nine (29) months this case has been open Crystal has failed to satisfactorily complete any significant portion of the case plan services. Any general assertions by Crystal that she 'could do' the things required of her under the case plan stand in stark contrast to the evidence that she has simply not completed those goals or satisfactorily evidenced an ability to do so – despite the significant assistance of the case plan services and the Agency.**

ADoc. 184 and BDoc. 179 at 8. The trial court went even further and made the following conclusion.

> **The Court finds that the [Agency] has made reasonable efforts to prevent the removal, to eliminate the continued removal, or make it possible for W.R. and K.R. to return home safely to the home of either parent. The Court further finds that the [Agency] has made reasonable efforts to make a permanency plan for W.R. and K.R. through foster placement and/or adoption services.**

ADoc. 184 and BDoc. 179 at 13. All of the findings of the trial court are supported by the record. Thus, the trial court's determination that the Agency made reasonable

efforts to reunify the family is not against the manifest weight of the evidence. The third assignment of error is overruled.

{¶30} Crystal's fourth assignment of error claims that the trial court's decision that granting the Agency's motion was in the best interest of the children is against the manifest weight of the evidence. "Once a trial court has determined that one of the enumerated provisions in R.C. 2151.414(B)(1) applies, it then must determine by clear and convincing evidence whether granting the agency permanent custody of the child is in the child's best interest." *In re A.N.*, 3d Dist. Marion No. 9-19-79, 2020-Ohio-3322, ¶ 5.

> **(D)(1) In determining the best interest of a child at a hearing held pursuant to division (A) of this section * * * the court shall consider all relevant factors, including, but not limited to, the following.**
>
> **(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;**
>
> **(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;**
>
> **(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two month period * * *.**
>
> **(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency.**

**(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.**

R.C. 2151.414. A trial court must either specifically address each of the required factors or otherwise provide some affirmative indication that it considered the listed factors. *A.N. supra.*

{¶31} In this case, the trial court specifically addressed the factors set forth in R.C. 2151.414(D)(1). ADoc. 184 and BDoc. 179 at 3-4, 6-7, 12-13. The findings of the trial court were supported by the evidence. Specifically, Shields made the following recommendations as to the best interest of the children in her report, which were used by the trial court in reaching its conclusions.

> **Since my appointment as CASA I have diligently followed this case and seen [W.R. and K.R.] in multiple settings. It is my opinion that both children should remain in the custody of [the Agency] and parental rights be terminated. Crystal began reengaging in services in 11/2019. She has had more than enough time to complete mental health services at FRC. She will go to a few appointments, and then get upset when a court hearing does not go her way and stop attending; and then restart, and then stop. Myself and her case worker have had multiple conversations with her explaining the importance of going to each and every appointment consistently, and if she does not, she may lose custody of her children. Crystal continues to be inconsistent and sporadic with counseling. I believe it is critical that Crystal attend her counseling appointments consistently to continue to work on and minimize her psychosis episodes, since she is unwilling to take the recommended medication. I have witnessed several of these episodes, and they are very disturbing, especially for her children. Crystal has told me she is stressed, overwhelmed and just needs a break. I believe if the children were to move home, the added stress would be too much for her to handle. In my opinion, it would only be a matter of time before the Agency**

> **would need to become involved again considering the family's past history and Crystal's unwillingness to deal with her mental health.**
>
> **\* \* \***
>
> **After the boys were removed from their Father's custody on 9/11/19, I witnessed the devastating and lasting affects it has had on the children. Both have needed, and continue to need, counseling to deal with their anger issues, sadness, lashing out and hitting others, bed-wetting & bathroom issues, blaming themselves and more. They are both currently living in stable placements for over a year, and I believe to put them through another move that will most likely be unsuccessful would be detrimental to them. These boys need permanence and this is something neither parent can provide.**

Ex. I at 9-10.

{¶32} In its findings, the trial court noted that Crystal was bonded with the children and that they were bonded to her and each other. ADoc. 184 and BDoc. 179 at 12. When questioned about where the children wanted to be, they were inconsistent with their answers sometimes wanting to be with Crystal and other time wanting to stay in their present situations. *Id.* The trial court noted that most recently, both boys indicated they wanted to stay where they were. *Id.* As to the need for permanency, the trial court noted that continuing this case longer would be detrimental to the children. *Id.* at 12-13. There is competent and credible evidence in the record to support the findings of the trial court. Thus, the fourth assignment of error is overruled.

{¶33} Having found no prejudicial errors in the particulars assigned and argued, the judgments of the Court of Common Pleas of Shelby County, Juvenile Division are affirmed.

***Judgments Affirmed***

**MILLER and SHAW, J.J., concur.**

**/hls**